UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMAR ALZOKARI,

Plaintiff,

v.

Case No. 22-cv-12286
Hon. Matthew F. Leitman

MARCO RUBIO[1],

Defendant.

______________________________________________________________________/

**ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 18) AND (2) DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 29)**

In 1990, Plaintiff Omar Alzokari's father, who was then a naturalized United States citizen, applied to the United States Department of State for a passport for Alzokari. At that time, Alzokari was five years old and living in Yemen (where he had been born). In order to obtain a passport for Alzokari, his father had to convince the State Department that Alzokari was a United States citizen. Alzokari's father claimed in the passport application for Alzokari that Alzokari had become a citizen at birth because he was born to an American citizen (his father) who had lived in the United States for more than ten years. After reviewing the passport application, the

[1] This action was originally filed against Secretary of State Antony Blinken in his official capacity. Since the filing of this case, Marco Rubio has replaced Secretary Blinken as Secretary of State. Accordingly, the Court substitutes Secretary Rubio, in his official capacity, for Secretary Blinken, as the named Defendant in this action.

State Department agreed with Alzokari's father that Alzokari was a citizen on that basis, and it issued a United States passport to Alzokari. The State Department later renewed Alzokari's passport four more times.

In 2018, the State Department abruptly canceled Alzokari's passport on the ground that it had originally been issued in error (more than 25 years earlier). According to the State Department, it had mistakenly found that Alzokari was a citizen when it first issued his passport. The State Department said that Alzokari was not a citizen at that time because, contrary to its earlier determination, Alzokari's father had not lived in the United States for ten years prior to Alzokari's birth. The State Department decided that since Alzokari was not a United States citizen when he first obtained his passport (and because he had not become one in the intervening years), he was not entitled to a passport.

In this action, Alzokari seeks a declaration under Section 1503(a) of the Immigration and Nationality Act, 8 U.S.C. § 1503(a), that he is a United States citizen. The dispositive question with respect to Alzokari's right to such a declaration is: has Alzokari shown that his canceled passport constitutes *prima facie* evidence that he is a United States citizen? This case turns on that question because (1) it is Alzokari's burden to present *prima facie* evidence that he is a citizen; and (2) due to the passage of time and his father's dementia, Alzokari has no evidence other than the canceled passport that tends to show that he is a citizen. For the

reasons explained in detail below, Alzokari has not shown that his canceled passport is *prima facie* evidence of his citizenship. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 18) and **DENIES** Alzokari's Cross-Motion for Summary Judgment (ECF No. 29).

**I**

Before recounting the facts of this case, the Court offers some background concerning the legal rules governing United States citizenship, passports, and passport revocation. This background provides helpful context for understanding the facts and legal issues in this case.

**A**

"There are 'two sources of United States citizenship, and two only—birth and naturalization.'" *Hizam v. Kerry*, 747 F.3d 102, 107 (2d Cir. 2014) (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898)). A person's birth can give rise to United States citizenship in two circumstances. First, with very limited exceptions that do not apply here, the Constitution confers what has become known as "birthright citizenship" on a person born in this country. *Trump v. Barbara*, --- S.Ct. ---, 2026 WL 1870543 (2026). "Persons not born in the United States" may also "acquire citizenship by birth," but "only as provided by Acts of Congress." *Miller v. Albright*, 523 U.S. 420, 424 (1998). Where a person born outside of the United States claims citizenship under an Act of Congress, that claim must be evaluated

under the version of the Immigration and Nationality Act (the "INA") that was in effect at the time of the person's birth. *See Sessions v. Morales-Santana*, 582 U.S. 47, 52 & n.2 (2017). In assessing such a claim, courts demand "strict compliance with all congressionally imposed prerequisites [in the INA] to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981).

**B**

A passport is "a travel document issued by competent authority showing the bearer's origin, identity, and nationality, if any, which is valid for the admission of the bearer into a foreign country." 8 U.S.C. § 1101(a)(30). Congress has vested the Secretary of State (the "Secretary") with the sole authority to "grant and issue [United States] passports," 22 U.S.C. § 211a, but Congress has limited the universe of individuals to whom the Secretary may issue a passport. It has authorized the Secretary to grant a passport only to persons "owing allegiance, whether citizens or not, to the United States." 22 U.S.C. § 212. The Secretary, in turn, has adopted a regulation identifying "U.S. national[s]" as the only class of persons to whom he will issue a passport. 22 C.F.R. § 51.2. The Secretary defines "U.S. nationals" as persons who are either United States citizens or who have qualifying relationships

with certain United States territorial possessions (such as American Samoa[2]). *See* 22 C.F.R. § 51.1.

An applicant for a passport "has the burden of proving [to the Secretary] that he or she is a U.S. citizen or a non-citizen national." 22 C.F.R. § 51.41. To satisfy that burden, "[a] person born outside the United States" who is seeking a passport "must submit documentary evidence that he or she meets all the statutory requirements for acquisition of U.S. citizenship . . . under the provision of law . . . under which the person is claiming U.S. citizenship. . . ." 22 C.F.R. § 51.43.

A passport, itself, "does not confer citizenship upon its recipient." *Muthana v. Pompeo*, 985 F.3d 893, 909 n.11 (D.C. Cir. 2021) (quoting *Hizam*, 747 F.3d at 109). But under a federal statute, a passport does constitute "proof of United States citizenship . . . during its period of validity." 22 U.S.C. § 2705 (the "Passport Proof Statute").

Congress has also authorized the Secretary to "cancel any United States passport . . . if it appears that such document was illegally, fraudulently, or erroneously obtained from, or was created through illegality or fraud practiced upon, the Secretary." 8 U.S.C. § 1504(a); *accord* 22 C.F.R. § 51.62(a)(2). A passport is invalidated "as soon as" the State Department "approves the revocation

---

[2] For example, American Samoans are U.S. nationals by birth. *See* 8 U.S.C. § 1408(1).

notification." 22 C.F.R. § 51.4(g)(1). A person whose passport has been revoked as erroneously issued may request a post-deprivation hearing to review the basis for the revocation. *See* 8 U.S.C. § 1504(a); 22 C.F.R. § 51.70(a). Finally, "[t]he cancellation" of a passport "affect[s] only the document and not the citizenship status of the person in whose name the document was issued." 8 U.S.C. § 1504(a).

**C**

Where the Secretary cancels a previously issued passport on the ground that the passport holder was not a citizen when the passport was issued (and that the passport was therefore issued in error), the affected person may bring an action against the Secretary under 8 U.S.C. § 1503(a) ("Section 1503(a)") seeking a declaration that he is a citizen. In relevant part, Section 1503(a) provides:

> If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28 against the head of such department or independent agency for a judgment declaring him to be a national of the United States. . . .

8 U.S.C. § 1503(a).

Under Section 1503(a), a plaintiff is entitled to a *de novo* determination as to whether he is a United Sates citizen. *See Carino v. Garland*, 997 F.3d 1053, 1055 (9th Cir. 2021); *Hizam*, 747 F.3d at 108.

## II

### A

Omar Alzokari was born in Yemen on November 22, 1985. (*See* Compl. at ¶ 6, ECF No. 1, PageID.2.) His father, who was also born in Yemen, became a naturalized United States citizen on May 12, 1980. (*See* Naturalization Certificate, ECF No.18-4, PageID.118.) His mother was not a United States citizen, and she passed away before Alzokari's second birthday in 1987. (*See* Compl. at ¶ 8, ECF No. 1, PageID.2; Death Certificate, ECF No. 18-4, PageID.124.)

Alzokari's father applied for a United States passport on Alzokari's behalf in 1990. (*See* 1990 Passport Application, ECF No. 18-3, PageID.101.) As part of that application process, Alzokari's father sought to demonstrate that Alzokari qualified for a passport because he (Alzokari) was a United States citizen. To that end, Alzokari's father claimed that Alzokari became a citizen at birth under "Section 301(g) of the [INA]." (State Dep't Letter dated April 13, 2018, ECF No. 18-5, PageID.126 (explaining that claim of citizenship for Alzokari at time of passport application was "based" on Section 301(g) of the INA).) At the time of Alzokari's birth, Section 301(g) of the INA provided, in relevant part, that:

> The following shall be nationals and citizens of the United States at birth: . . .
>
> (7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United

> States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years . . . .

INA Section 301(g) (formerly Section 301(a)(7)) (codified at 8 U.S.C. § 1401(g) (1952 ed.)).

According to Alzokari's father, Alzokari qualified for citizenship under Section 301(g) of the INA – and was thus eligible to obtain a passport – because he (Alzokari's father) was a naturalized United States citizen who had been present in the United States for more than ten years prior to Alzokari's birth.

The State Department agreed that Alzokari was eligible for a passport. It approved the passport application and issued Alzokari a United States passport on November 25, 1990, when he was five years old. (*See* Def.'s Mot. for Summary Judgment, ECF No. 18, PageID.79 (citing Passport Application, ECF No. 18-3, PageID.101).) Five years later, Alzokari moved to the United States. (*See* Omar Alzokari Testimony at Passport Rev. Hr'g, ECF No. 18-7, PageID.156.)

At that time, his father applied to renew Alzokari's passport, and the State Department granted that request. (*See* Def.'s Mot. for Summary Judgment, ECF No. 18, PageID.79 (citing Passport Applications, ECF No. 18-3, PageID.101-103).) The State Department again renewed Alzokari's passport in 2000. (*See id.*)

**B**

In late 2001, when Alzokari was sixteen years old, his father applied to the Immigration and Naturalization Service for a Certificate of Citizenship on Alzokari's behalf. (*See* Application for Certificate of Citizenship, ECF No. 18-4, PageID.110-113.) A Certificate of Citizenship is "[a]n identity document proving U.S. citizenship . . . issued to derivative citizens and those who acquired U.S. citizenship." (Certificate of Citizenship, U.S. Citizenship and Immigration Services, available at: https://www.uscis.gov/glossary-term/78041 (last visited Apr. 20, 2026).) Unlike a passport, a Certificate of Citizenship does not expire. (*See* U.S. Citizenship and Immigration Services Policy Manual, Vol. 12, Part H, Chapter 3, ¶ D(2).) In the application for the Certificate of Citizenship, Alzokari's father checked the box indicating that Alzokari "claim[ed] United States citizenship through" his father. (*See* Application for Certificate of Citizenship, ECF No. 18-4, PageID.111.)

Alzokari's father was then invited to attend an interview in connection with the application for the Certificate of Citizenship. (*See* Notice of Interview, ECF No. 18-4, PageID.114.) He was directed to bring to that interview, among other documents, "evidence that [he] resided in the United States for 10 years prior to the birth of the applicant, of which 5 years must be after the age of Fourteen (14)." (*Id.*)

The interview was set for May 2, 2002. (*See id.*) At that time, Alzokari's father did not speak English well; his primary language was Arabic. (*See* Passport

Rev. Hr'g Tr., ECF No. 18-7, PageID.156-158; Alzokari 04/20/2023 Dep., ECF No. 18-2, PageID.96-97; Decl. of Abdo Saleh Alhamy, ECF No. 20-3, PageID.311; Decl. of Ahmed A. Hidais Jr., ECF No. 20-4, PageID.314.) There is no evidence in the record that the interviewer spoke Arabic or that an Arabic interpreter attended the interview. (*See generally* Passport Rev. Hr'g Tr., ECF No. 18-7; Alzokari 04/20/2023 Dep., ECF No. 18-2.) But Alzokari did attend with his father. (*See id*.)

On the record now before this Court, it appears that the only proof of residence that Alzokari's father brought with him to the interview was a FICA Earnings Summary issued to him by the Social Security Administration. That summary showed that Alzokari's father had earned income through work in the United States between 1974 to 1981, a total of eight years. (*See* FICA Earnings Summary, ECF No. 18-4, PageID.118-119.) Thus, the summary did not establish that Alzokari's father had lived in the United States for ten years prior to Alzokari's birth, as required to render Alzokari eligible for citizenship under Section 301(g) of the INA.

Before a final decision was issued on the application, Alzokari's father filed a written notice withdrawing the application. (*See* Withdrawal Notice, ECF No. 18-4, PageID.116.) His father did not list a reason for the withdrawal on the notice. (*See id.*) However, there are undated handwritten notes by an unidentified author on the Withdrawal Notice (and on some related papers) that appear to suggest that Alzokari's father withdrew the notice because he recognized that his proof of

residency in the United States was insufficient. For instance, the notes provided, among other things, that:

- "He needs proof 10 yrs 5/14 . . . IRS records, affidavits, etc." (*Id.*, PageID.115);
- "Father Musleh doesn't have 10 years residence in USA 5/14 prior to Omar's Birth. He only had 8 years." (*Id.*, PageID.116); and
- "Father Musleh admitted he did not have 10 years residence proof. Claims only 8. Also claims he went back to Yemen in 8/- no proof, etc. etc. Omar has U.S. passport issued in CHI. Musleh given option to withdraw. Subject repeatedly tried to talk me into adding two years to case." (*Id.*, PageID.117.)

**C**

Even though Alzokari's father was unable to establish Alzokari's citizenship, the Secretary continued to treat Alzokari as a United States citizen. For instance, the Secretary renewed Alzokari's passport two more times – in 2005 and 2015 – after Alzokari's father withdrew the application for a Certificate of Citizenship. (*See* Def.'s Mot. for Summary Judgment, ECF No. 18, PageID.79 (citing Passport Applications, ECF No. 18-3, PageID.104-109).) Likewise, the U.S. Citizenship and Immigration Services allowed Alzokari's wife, who was born in Yemen, to "immigrate[] to the [United States] on the basis of a petition which [Alzokari] filed upon her behalf to classify her as the spouse of a U.S. citizen [*i.e.*, Alzokari]." (Compl. at ¶ 19; *see also* Alzokari 04/20/2023 Dep., ECF No. 18-2, PageID.99.) She

has since naturalized. (*See* Compl. at ¶ 20, ECF No. 1, PageID.4.) Similarly, Alzokari's first child was born in Yemen and "came to the United States as the beneficiary of a petition filed upon his behalf by [Alzokari]." (*See id.* at ¶ 24; *see also* Alzokari 04/20/2023 Dep., ECF No. 18-2, PageID.99.) Alzokari now has five additional children, who "are native born U.S. citizens." (Compl. at ¶ 22, ECF No. 1, PageID.4.)

**D**

In April of 2018, the Secretary – after having issued Alzokari a total of five passports since 1990 – revoked Alzokari's passport on the ground that the passport had been "issued in error." (State Dep't Letter dated April 13, 2018, ECF No. 18-5, PageID.126.) The notice of revocation explained that "[a]n investigation revealed that [Alzokari's] father did not have sufficient physical presence in the United States prior to [Alzokari's] birth to transmit citizenship to [Alzokari]" through Section 301(g) of the INA. (*Id.*)

The notice also advised Alzokari that he had a right to a hearing on the revocation decision (*see id.*, PageID.127), and Alzokari requested that such a hearing be held. (*See* Letter from Michael E. Piston and Omar Alzokari, ECF No. 18-6, PageID.128.) The State Department held the hearing on October 29, 2019. Alzokari, his brother, and his father testified at the hearing. (*See* Hr'g Tr., ECF No. 18-7.) However, by that time, Alzokari's father had developed severe memory

problems, and he was unable to provide useful testimony about where he lived prior to Alzokari's birth. (*See* Resp., ECF No. 18, PageID.81; Musleh Alzokari Medical Records, ECF No. 20-5, PageID.318.)

On February 24, 2020, the State Department issued a decision upholding the revocation of Alzokari's passport. (*See* Action Memo., ECF No. 18-8, PageID.195-198.) It notified him of that final decision on March 3, 2020. (*See* Compl. at ¶ 11, 29, ECF No. 1, PageID.3, 4.)

**E**

On April 8, 2020, Alzokari filed an action in the United States District Court for the District of Columbia against the State Department challenging the revocation of his passport. *See Alzokari v. U.S. Dep't of State*, U.S. District Court for the District of Columbia, Civil Action No. 20-cv-937 ("the D.D.C. Action"). The procedural history of the D.D.C. Action is central to several of the arguments that Alzokari advances in this action, and the Court therefore recounts that history in some detail below.

In the D.D.C. Action, Alzokari brought a single claim against the State Department under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"). In that claim, he contended that the decision to revoke his passport on the basis that he lacked citizenship should be set aside because it was arbitrary and capricious. Critically, while Alzokari claimed that the revocation of his passport

was unwarranted, he did *not* claim that he was a United States citizen, nor did he suggest that he had any evidence that that he was a citizen. On the contrary, Alzokari conceded that he could not "unequivocally claim that he is [a citizen]." (Pla.'s Opp. to Def.'s Mot. to Dismiss, *Alzokari v. Dep' of State*, No. 20-937, at *2 (D.D.C. Sept. 22, 2020) (citing Compl. at ¶ 2, ECF No. 1, *Alzokari v. U.S. Dep't of State*, No. 20-937).) Instead, the most he could say was "to the best of his knowledge" he was a citizen. (*Id.*)

Alzokari explained that he had no evidence to show his citizenship because for over 25 years, he had "relied upon the [State] Department's finding [in 1990 and every time thereafter that it had renewed his passport] that he was a U.S. citizen." (*Id.* at *4 n.2.) In Alzokari's words, "there was never any need for him to obtain from his father evidence of his father's 10 year presence in the U.S." before his birth. (*Id.*) And he said that he could no longer obtain such evidence of his father's presence here because his father had lost his memory. (*See id.*)

Alzokari alleged that even though he did not claim to be a United States citizen, the Secretary acted arbitrarily in revoking his passport because the Secretary's decision was not supported by substantial evidence. (*See* Compl., ECF No. 1, *Alzokari v. U.S. Dep't of State*, No. 20-937.) Thus, he claimed that he was entitled under the APA to have the revocation of his passport set aside.

The State Department moved to dismiss Alzokari's APA claim. It argued that Alzokari could not proceed under the APA because he had an adequate alternative remedy: he could file an action under Section 1503(a) seeking a *de novo* judicial determination that he is a citizen. (*See* Def.'s Mot. to Dismiss, *Alzokari v. U.S. Dep't of State*, No. 20-937, at *5 (D.D.C. Aug. 31, 2020).)

In response, Alzokari argued that an action under Section 1503(a) was not a sufficient alternative remedy because in such an action he (Alzokari) would have to satisfy a "substantially higher burden of proof" as compared to his claim under the APA. (Pla.'s Opp. to Def.'s Mot. to Dismiss, *Alzokari v. Dep't of State*, No. 20-937, at *3 (D.D.C. Sept. 22, 2020).) More specifically, Alzokari contended that in an action under Section 1503(a), he would be required to make a *prima facie* showing of citizenship by birth, whereas in an action under the APA, he would not be required to "provide any evidence that he is a U.S. national at all." (*Id.* at *2.) He stressed that in an APA action, he could prevail by undermining the rationality of the Secretary's decision to revoke his passport. (*See id.* at *2–3)

Alzokari argued that the higher burden in an action under Section 1503(a) action would preclude him from obtaining relief on a claim under that statute. He could not prevail on a claim under Section 1503(a), he said, because he was not able to present any affirmative evidence of citizenship. Indeed, (as noted above) he stressed that he could not even "unequivocally claim" that he was a citizen. (*Id.* at

*2.) And he insisted that because he could not satisfy the higher burden under Section 1503(a), an action under that statute could not be an adequate alternative remedy to his claim attacking the revocation of his passport under the APA. (*Id.* at *2–7.) (Notably, Alzokari did not suggest that his revoked passport was any evidence that he was a citizen. Much more on that later.)

In reply, the State Department disputed Alzokari's contention that his burden under Section 1503(a) would be substantially higher than his burden under the APA. The State Department set forth its view of the burden under Section 1503(a) as follows:

> To initiate an action under Section 1503(a), a "plaintiff need make only a *prima facie* case establishing her citizenship by birth or naturalization." *Xia*, 865 F.3d at 652 (citation omitted). This "may be as simple as '[p]resenting proof of a naturalization certificate or passport—even if already administratively cancelled.'" *Alsaidi*, 292 F. Supp. 3d at 326 (quoting *Xia*, 865 F.3d at 652). "The government must then respond with clear, unequivocal, and convincing evidence rebutting the plaintiff's showing of citizenship." *Xia*, 865 F.3d at 652. If Plaintiff cannot make this simple showing, as he acknowledges, he likewise cannot carry his burden of proving that the Department's decision to revoke his passport was somehow arbitrary and capricious in violation of the APA.

(Reply in Support of Def.'s Mot. to Dismiss, *Alzokari v. U.S. Dep't of State*, No. 20-937, at *2 (D.D.C. Oct. 07, 2020) (quoting *L. Xia v. Tillerson*, 865 F.3d, 643, 656 (D.C. Cir. 2017)).)

The court in the D.D.C. Action agreed with the State Department that Alzokari could not proceed on his APA claim because Section 1503(a) provided him an adequate alternative remedy. The court offered the following analysis:

> As numerous courts have found, section 1503(a) provides an adequate alternative remedy to an APA claim where a claimant seeks review of the State Department's determination that they are not a U.S. national. *See Xia*, 865 F.3d at 655 (stating that 8 U.S.C. § 1503 "provides plaintiffs an adequate avenue to assert their citizenship claims"); *Ali v. U.S. Dep't of State*, Case No. 20-01436 (RJL) 2021 WL 1026068, *3 (Mar. 17, 2021) (dismissing plaintiff's APA claim challenging revocation of passport because section 1503 provides adequate alternative remedy); *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 326 (D.D.C. 2018) (dismissing plaintiff's APA claim regarding denial of her passport renewal because section 1503 provides an adequate alternative remedy); *Hassan v. Holder*, 793 F. Supp. 2d 440, 445-46 (D.D.C. 2011) (same with respect to passport revocation).
>
> Alzokari argues section 1503(a) is not an adequate alternative remedy because (1) the relief section 1503(a) offers—being declared a U.S. national—is not the relief he seeks, and (2) section 1503(a) requires a higher burden of proof than does an APA claim. ECF No. 13, Pl. Opp'n at 2-7. Neither argument is persuasive.
>
> First, Alzokari fails to meaningfully distinguish the relief he seeks from the relief offered by § 1503(a). He frames his APA suit as a request to set aside the Department's revocation decision, and he maintains that he "is not seeking a declaration that he is a U.S. national." *Id.* at 2. But the Department revoked Alzokari's passport on the basis that it lacked sufficient evidence that he was a U.S. national, Compl. ¶¶ 29-30, a requirement for a U.S. passport, 22 C.F.R. § 51.2. For a remedy to be "an adequate alternative," it "need not provide relief identical

> to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia*, 563 F.3d at 522 (citation omitted). The relief offered by section 1503(a)—a declaration that Alzokari is a U.S. national—is certainly of the "same genre" as the relief Alzokari seeks under the APA, because both produce "effectively the same result—a determination that the State Department must treat plaintiff as if he is a U.S. national." *Ali*, 2021 WL 1026068, at *11.
>
> Alzokari's second argument is based on the faulty premise that section 1503(a) demands "a substantially higher burden of proof" because it requires him to make a *prima facie* showing of citizenship. Pl.'s Opp. at 3. But as the D.C. Circuit has explained, "[t]he threshold showing required of a section 1503 plaintiff is minimal." *Xia*, 865 F.3d at 656 (noting that "[p]resenting proof of a ... passport—even if already administratively cancelled—would seem to satisfy that *prima facie* requirement"). The burden then shifts to the government to "establish by clear, unequivocal, and convincing evidence the plaintiff's lack of entitlement to the disputed 'right or privilege' of citizenship." *Id.* The "minimal" burden imposed on Alzokari under section 1503(a) is thus not sufficient to render § 1503(a) an inadequate alternative to relief available under the APA. *See Ali*, 2021 WL 1026068, at *8.

*Alzokari*, 2021 WL 4622459, at *2–3. Based on its conclusion that Section 1503(a) provided Alzokari with a sufficient alternative remedy, the district court granted the State Department's motion to dismiss Alzokari's APA claim. *See id.* at *3.

After stating its decision, the district court said that it was "sympathetic to Alzokari's frustrations with the [State] Department's conduct in recognizing him as

a U.S. national for almost thirty years, only to reverse that determination with minimal explanation." *Id.*

**F**

Alzokari appealed the district court's decision in the D.D.C. Action to the United States Court of Appeals for the D.C. Circuit. In the appellate court, he suggested for the *first* time that, at least within the D.C. Circuit, his canceled passport *would* constitute *prima facie* evidence of his citizenship. But he told the D.C. Circuit than an action under Section 1503(a) was still not an adequate alternative to his APA claim challenging the revocation of his passport because his canceled passport would not be treated as *prima facie* evidence by the court in which he would be required to file his claim under Section 1503(a). He framed the question on appeal as:

> Where the plaintiff holds a revoked U.S. passport, is the fact that this Court allows a person to make a *prima facie* showing of U.S. nationality based upon this document sufficient to establish that an action under 8 U.S.C. § 1503(a) is an adequate alternative remedy to an action under the Administrative Procedure Act to set aside and hold unlawful a decision by an administrative agency to revoke the plaintiff's U.S. passport, where such evidence would not be sufficient to make a *prima facie* showing under 8 U.S.C. § 1503(a) in the judicial district were such action must be brought, and the plaintiff does not claim to otherwise have *prima facie* evidence of U.S. nationality?

(Pla.-Appellant's Br., *Alzokari v. U.S. Dep't of State*, No. 21-5255, 2022 WL 561610, at *5 (D.C. Cir. Feb. 21, 2022).)

He then summarized his argument on appeal as follows:

> The district court dismissed this action on the ground that Mr. Alzokari had an[] adequate alternative remedy to the Administrative Procedure Act, namely, an action under 8 U.S.C. § 1503(a) for a judgment declaring him to be a national of the United States. He argued below that this was not an adequate alternative remedy in that it required him to make at least a *prima facie* showing that he was a U.S. national, which he was unable to do inasmuch as he had relied upon the Department's multiple implicit findings that he was a U.S. citizen to not develop evidence of his nationality on his own. The court rejected this objection because it held that Mr. Alzokari could carry that burden of proof merely by submitting his revoked passport. However, in doing so, it relied solely upon the case law of this Court, whereas under § 1503(a), Mr. Alzokari would be required to bring an action under that statute in the judicial district with jurisdiction over his place of residence. Mr. Alzokari resides in the state of Mississippi, which is within the jurisdiction of the 5th Circuit Court of Appeals. The 5th Circuit has upheld a lower court's rejection of the argument that a plaintiff may carry his burden of proof in an action under § 1503(a) by submitting an invalid passport, and held expressly that even a valid certificate of citizenship was insufficient evidence of U.S. nationality.

(*Id.* at *11–12.)

In its appeal brief, the State Department reiterated many of its arguments that Section 1503(a) provides an adequate alternative remedy to an APA claim. (*See* Corr. Appellee Br., *Alzokari v. U.S. Dep't of State*, No. 21-5255, 2022 WL 1422288, at *11–17 (D.C. Cir. May 4, 2022).) It also noted that Alzokari's argument that a Section 1503(a) action was not an adequate alternative remedy because the case law

in the Fifth Circuit differed from that of the D.C. Circuit was a new argument that the court should reject for not being asserted before the district court. (*See id.* at *17 n.1.)

In reply, Alzokari provided a "Statement of Acquiescence," in which he stated that he

> withdraws [his] opposition to, and now acquies[c]es in, the holding of the District Court that:
>
> "[t]he threshold showing required of a section 1503 plaintiff is minimal." *Xia*, 865 F.3d at 656 (noting that "[p]resenting proof of a . . . passport-- even if already administratively cancelled--would seem to satisfy that *prima facie* requirement"). The burden then shifts to the government to "establish by clear, unequivocal, and convincing evidence the plaintiff's lack of entitlement to the disputed 'right or privilege' of citizenship." *Id.* The "minimal" burden imposed on Alzokari under section 1503(a) is thus not sufficient to render § 1503(a) an inadequate alternative to relief available under the APA. *See Ali*, 2021 WL 1026068, at *8.

(Pla.-Appellant's Reply Br., *Alzokari v. U.S. Dep't of State*, No. 21-5255, 2022 WL 2178581, at *2 (D.C. Cir. June 14, 2022).) Alzokari then withdrew his appeal. *See Alzokari v. U.S. Dep't of State*, No. 21-5255, 2022 WL 2279982, at *1 (D.C. Cir. June 22, 2022) (granting appellant's motion to dismiss the appeal).

**G**

On September 29, 2022, Alzokari brought this action against the Secretary under Section 1503(a) and 28 U.S.C. § 2201, seeking a declaration that he is a United States citizen. (*See* Compl., ECF No. 1.) He now claims "upon information and belief" that he is "a national of the United States." (*Id.* at ¶ 2, PageID.1.)

The parties have conducted discovery and have filed cross-motions for summary judgment. (*See* Def.'s Mot. for Summary Judgment, ECF No. 18; Pla.'s Resp. and Cross-Mot. for Summary Judgment, ECF No. 20; Pla.'s Cross-Mot. for Summary Judgment, ECF No. 29.) The Court held a hearing on the cross-motions on January 12, 2026, a follow-up virtual evidentiary hearing on March 24, 2026, and a follow-up pretrial conference during which it heard additional arguments from the parties on August 4, 2026. The Court is now prepared to rule on the motions.

**III**

Before turning to the merits of Alzokari's Section 1503(a) claim, the Court first takes up the Secretary's argument that the Court should dismiss the action on the basis that Alzokari filed it in the wrong venue. The Secretary argues that Alzokari was required to file this action in United States District Court for the Northern District of Mississippi. The Court disagrees.

**A**

Section 1503(a) provides that "[a]n action under this subsection . . . shall be filed in the district court of the United States for the district in which [the plaintiff] resides or claims a residence, and jurisdiction over such officials in such cases is conferred upon those courts." 8 U.S.C. § 1503(a).

The word "resides" is not defined in the INA (the Act containing Section 1503(a)). But the word "residence" is. The INA defines "residence" as a person's "place of general abode," that is, "his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). Other district courts that have considered Section 1503(a)'s residency requirement in great depth have concluded that "the definition of 'residence' naturally provides guidance as to the meaning of 'resides'" in the context of Section 1503(a) because of their close proximity in the statute and their close conceptual relationship. *Villafranca v. Pompeo*, 486 F.Supp.3d 1078, 1083 (S.D. Tex. 2020). *See also Salinas v. Blinken*, No. 1:22-CV-134, 2023 WL 7165868, at *4 (S.D. Tex. Oct. 31, 2023) (looking to INA's definition of "residence" when construing the term "resides" in Section 1503(a) because "when words 'are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar'") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012)); *Holly v. Blinken*, No. 20-CV-18938, 2022 WL 951369, at *4 (D.N.J.

Mar. 30, 2022) (same). These courts have further explained that looking to the INA's definition of "residence" to discern the meaning of resides in Section 1503(a) makes sense because the INA's definition of "residence" accords with the ordinary meaning of the term "resides" at the time Congress enacted the statute. *Villafranca*, 486 F.Supp.3d at 1083; *Salinas*, 2023 WL 7165868, at *4–5. These courts have concluded that the term "resides" in Section 1503(a) – when read against the backdrop of the definition of "residence" in the INA – "require[s] that at the time of filing her lawsuit, the plaintiff used a specific location within the District as her principal, actual dwelling place in fact, without regard to intent." *Salinas*, 2023 WL 7165868, at *5.

To determine whether a person has a principal, actual dwelling place in a judicial district – and thus whether the person "resides" there for purposes of Section 1503(a) – courts have looked to a wide range of non-exhaustive factors, such as "whether [the plaintiff] owned or rented a home in that judicial district, where he paid taxes, where any car was registered and licensed[,] where his possessions were located, and where his family members resided." *Arango*, 670 F.3d at 999. They have also considered where a plaintiff "lives, works, and . . . can generally be found," *Villareal v. Horn*, 207 F.Supp.3d 700, 707 (S.D. Tex. 2016) (quoting *Ortiz v. Kerry*, No. 1:12-CV-26, Slip. Op. (S.D. Tex. May 29, 2013)), as well as the timing of a plaintiff's move and the location of a plaintiff's businesses. *See Salinas*, 2023 WL

7165868, at *6. Finally, according to the Fifth Circuit, the plaintiff's "actual whereabouts" may be the "most notabl[e]" factor with respect to determining where he resides. *Flores v. Pompeo*, 936 F.3d 273, 277 (5th Cir. 2019).

**B**

Applying the factors set forth above to the facts in this record, the Court concludes that Alzokari resided in the Eastern District of Michigan – that is, he "used a specific location within [this] District as [his] principal, actual dwelling place in fact, without regard to intent" – when he filed his lawsuit here on September 27, 2022. *Salinas*, 2023 WL 7165868, at *5.[3]

The record reveals that Alzokari spent much of his life prior to September of 2022 in Mississippi. He moved there shortly after he dropped out of high school in the ninth grade. (*See* Alzokari 04/20/2023 Dep., ECF No. 18-2, PageID.93.) At some point thereafter, he bought a house in Oxford, Mississippi, and lived there with his wife and six children. In addition, after moving to Oxford, he opened and/or managed multiple local convenience stores in the Oxford area, and for many years he would visit those stores in person nearly every day. (*See id.*, PageID.402-404.) He also applied for and obtained a Mississippi driver's license, registered and

[3] Alzokari argues in the alternative that he "claim[ed] a residence" in the Eastern District of Michigan at the time he instituted this action. (*See* Pla.'s Corr. Resp. Regarding Venue, ECF No. 30, PageID.519-523.) Because the Court finds that Alzokari resided here, it does not reach his alternative arguments about the meaning and application of the phrase "claims a residence."

insured his car in Mississippi, banked with a Mississippi financial institution, and used his Oxford home address on corporate documents for his businesses. (*See* ECF No. 27-3, PageID.412; Omar Alzokari Testimony at Remote Continued Hearing before the Court on 3/24/2026.)

In 2016, Alzokari bought a second house in Hamtramck, Michigan (near where his father lived). From that point forward, Alzokari and his family would spend summers in Hamtramck and would spend the rest of the year back in Oxford. (*See* Alzokari 02/18/2026 Dep., ECF No. 27-2, PageID.396.)

Alzokari and his family reversed their routine beginning in 2022. They began spending summers in Oxford and the rest of the year – the bulk of their time – living in Hamtramck. More specifically, in 2022, Alzokari and his family (who had spent the first part of the summer in Hamtramck) went back to Mississippi for the month of August, and they returned to Hamtramck in September. They then lived together in their Hamtramck home until June of 2023. (*See id.*, PageID.396-397.) Alzokari submitted credit card statements showing that he regularly shopped at Michigan grocery stores and ate at Michigan restaurants during that time period. (*See* ECF Nos. 30-5, 30-6, PageID.562-594.) While living in Hamtramck, he managed his Mississippi convenience stores remotely. (*See* Alzokari 02/18/2026 Dep., ECF No. 27-2, PageID.405-406.)

Alzokari and his family continued their pattern of living primarily in Hamtramck – and spending only summers in Oxford – for the next several years. He has attested that he and his family have "lived in Hamtramck for approximately 31 months since September, 2022." (Alzokari Decl. at ¶ 13, ECF No. 30-1, PageID.529.) And they live there now. (*See id.*)

Based upon all of these circumstances, the Court is persuaded that Alzokari resided in Hamtramck in September of 2022 when he filed this civil action. While he appeared to reside in Oxford before that time, the evidence in the record persuades the Court that Hamtramck became his "principal, actual dwelling place in fact" at that point. In the words of the Fifth Circuit, from that point forward, his "actual whereabouts" were mostly in Hamtramck – where he began living with his family for nine months of the year. He owned a home there, had possessions there, and transitioned to managing his Mississippi businesses remotely from there. In a word, he "resided" there as of September 2022. And because he resided there, he properly filed this action in this judicial district under Section 1503(a).

**C**

The Court acknowledges that other evidence in the record cuts against the Court's conclusion that Alzokari resided in Hamtramck when he filed this action. Indeed, the record admittedly contains some evidence that suggests that Alzokari has always resided in Oxford and that he never really relocated to Hamtramck. For

instance, he registers his vehicles in Mississippi, he insures his vehicles in Mississippi, he has maintained a Mississippi driver's license, and for at least some time after 2022, he has continued to list his Oxford address as his residence on corporate filings with the State of Mississippi. But in the Court's opinion, Alzokari's failure to update his address with the State of Mississippi and with his vehicle insurer does not outweigh the evidence on this record that he, in fact, relocated himself and his family to Hamtramck in September of 2022 – and, as explained above, that relocation persuades the Court that he began to reside here at that time. Indeed, despite Alzokari's failure to update his address information to reflect his move to Hamtramck, his connections to this judicial district are much stronger than the connections deemed insufficient to support a finding of residence in the cases cited by the Secretary. *See, e.g.*, *Villafranca*, 486 F.Supp.3d at 1087 (holding that petitioner who was physically present in district at time of filing did not reside in district where "the only relevant evidence supporting" her claimed residency at the time of filing was her name "on the account for cable television and internet service at [an] address" within the district); *Chacoty v. Pompeo*, 392 F.Supp.3d 1, 18 (D.D.C. 2019) (holding that petitioner who was physically present in district at time of filing did not reside in judicial district where she had only traveled to the district "on three occasions" and where there was "no evidence that these visits to the

[district] were anything other than vacation visits to see family and attend family events.”).

Next, the fact that Alzokari continued to own and operate businesses in Oxford after September of 2022 does not persuade the Court that he continued to live there. “[I]t is true that individuals typically work in the same area in which they live. But not always.” *Salinas*, 2023 WL 7165868, at *6. Here, as noted above, the record shows that Alzokari managed his Mississippi-based businesses remotely for the majority of the year after September 2022, and that method of running his stores “do[es] not directly controvert” his showing that he resided in Hamtramck. *Id*. (rejecting contention by the Secretary that petitioner did not reside in a particular judicial district because she owned property and conducted business in another district).

Finally, the Court rejects the implication by the Secretary that Alzokari’s motive for moving to Hamtramck undercuts Alzokari’s contention that he truly resides there. (*See* Supp. Br., ECF No. 27, PageID.380 – noting that Alzokari “relocated [to Hamtramck] at least partly to file this lawsuit.”) That suggestion is contrary to the plain language of the INA, which requires the Court to assess where Alzokari resided “in fact, without regard to intent.” 8 U.S.C. § 1101(a)(33). As another district court observed, for purposes of determining where a petitioner

resides under Section 1503(a), his "motives do not form part of [the] analysis" – which is strictly confined to "objective" factors. *Salinas*, 2023 WL 7165868, at *7.

**D**

For all of these reasons, the Court finds that Alzokari resided in Hamtramck, Michigan, in the Eastern District of Michigan, at the time that he filed this action. Thus, this judicial district is the proper venue under Section 1503(a).

**IV**

The Court now turns to the merits of the parties' dispute under Section 1503(a). Both parties seek summary judgment under Federal Rule of Civil Procedure 56. Pursuant to that rule, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326–27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

**V**

As noted above, in this action, Alzokari seeks a declaration under Section 1503(a) that he is a United States citizen. He may proceed under Section 1503(a) because the Secretary canceled his passport – and thus "denied" him the "right or privilege" of holding a passport – on the basis that he is not a citizen. 8 U.S.C. § 1503(a). For the reasons explained below, the Court concludes that on this record, Alzokari has failed to show that he is entitled to a declaration that he is a citizen under Section 1503(a). The Court's analysis begins with the proper procedural framework to be applied to Alzokari's claim under Section 1503(a) and then applies that framework to show why Alzokari has failed to establish his right to a declaration that he is a citizen.

**A**

The first question that the Court must answer with respect to Alzokari's claim under Section 1503(a) is: what is the proper procedural framework for analyzing the claim? Neither the Supreme Court nor the Sixth Circuit have squarely answered that question, but courts addressing claims under Section 1503(a) have applied two different frameworks. Some courts have held that a plaintiff asserting a Section 1503(a) claim "'need make only a *prima facie* case establishing [his] citizenship by birth or naturalization,'" and that if he makes that showing, the Secretary must then respond with "'clear, unequivocal, and convincing'" evidence rebutting the

plaintiff's showing of citizenship (the "Prima Facie Framework"). *L. Xia*, 865 F.3d at 652 (quoting *Perez v. Brownell*, 356 U.S. 44, 47 n.2 (1958), *overruled on other grounds by Afroyim v. Rusk*, 387 U.S. 253 (1967)). Other courts require a plaintiff to prove that he is a United States citizen by a preponderance of the evidence (the "Preponderance Framework"). *See Lall v. Dep't of Homeland Sec.*, 117 F.4th 87, 94 (3d Cir. 2024); *Esparza v. Rubio*, No. 25-40219, 2026 WL 625925, at *3 (5th Cir. Mar. 5, 2026) (citing *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958)).

Here, the Court need not undertake the difficult task of determining which framework is more faithful to Section 1503(a) because, as counsel for the Secretary acknowledged at the hearing before the Court on January 12, 2026, and in his reply brief (*see* Reply, ECF No. 22, PageID.325 and n.1), the Secretary is judicially estopped from seeking application of the Preponderance Framework and from opposing Alzokari's invocation of the Prima Facie Framework.[4] "Judicial estoppel 'forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.'" *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (quoting *Teledyne Industries, Inc. v. NLRB*, 911 F.2d 1214, 1217 (6th Cir. 1990)). Judicial estoppel is always "applied with

[4] While the Secretary conceded that he is estopped from urging application of the Preponderance Framework, and that the Court should therefore apply the Prima Facie Framework, for the reasons explained below (*see* Section (V)(B)(2)(b)(ii)), the Secretary is not judicially estopped from arguing that Alzokari cannot satisfy the Preponderance Framework.

caution." *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 575 (6th Cir. 2020). And it "is construed even more narrowly when requested against the government." *Id.*

Here, it is appropriate to judicially estop the Secretary from opposing application of the Prima Facie Framework given his concession that he should be so estopped. And in any event, all of the elements of judicial estoppel are satisfied with respect to the applicable framework issue. As noted above, in the D.D.C. Action, the Secretary argued that the Prima Facie Framework would govern a claim by Alzokari under Section 1503(a), and the district court dismissed Alzokari's APA claim in that case in large part based upon its conclusion – urged by the Secretary – that Alzokari would only have to satisfy the Prima Facie Framework in a subsequent action under Section 1503(a). Any contention by the Secretary that the Prima Facie Framework does not apply would be inconsistent with the position he successfully argued in the D.D.C. Action. The Court will therefore apply the Prima Facie Framework to Alzokari's claim.

**B**

At the first step of the Prima Facie Framework, the Court must determine whether Alzokari has presented *prima facie* proof supporting his claim to citizenship. He has not. His claim therefore fails at this stage of the analysis.

**1**

As noted above, Alzokari's claim to citizenship rests on Section 301(g) of the INA. At the time of Alzokari's birth, that statute provided that "a person born outside the geographical limits of the United States" was deemed a "national[] and citizen[] of the United States at birth" if one of his parents was "a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years…." Given Alzokari's reliance on Section 301(g), at the first stage of the Prima Facie Framework, he must present *prima facie* evidence that prior to his birth, his father (who was a naturalized United States citizen when Alzokari was born) had lived in the United States for a total of ten years – at least five of which were after he had attained the age of fourteen.

Alzokari has not presented *prima facie* proof that his father lived in this country for the required ten-year period. Indeed, he has not presented *any* evidence that his father lived here for ten years – no records or other documents showing ten years of residency by his father, no witness testimony showing such residency, and no other circumstantial evidence (such as family photographs) demonstrating such residency. Given this evidentiary shortcoming, the Court must conclude that Alzokari has failed to make a *prima facie* showing that he is a United States citizen.

**2**

Alzokari counters that his canceled passport constitutes *prima facie* evidence of his citizenship. But he has failed to show that that contention is correct.

**a**

Alzokari's briefing offers very little reasoning and legal authority to support his contention that his canceled passport is *prima facie* evidence of his citizenship. (*See* Resp. and Cross-Mot. for Summ. J., ECF No. 20, PageID.273.) His primary argument on this point in his briefing consists of the following two sentences:

> A U.S. passport does not have to be currently valid to be accepted as proof of U.S. citizenship, as long as it was originally issued without limitation." 42 C.F.R. 436.407 (2025). Omar Alzokari['s] passport was originally issued without limitation.

(*Id.*) The problem with this argument is that the cited regulation governs the eligibility requirements for medical assistance programs in Guam, Puerto Rico, and the Virgin Islands. *See* 42 C.F.R. §§ 430–456. Alzokari has not cited any authority suggesting that the regulation applies – or was intended to apply – in any other context. And the Court sees no reason to conclude that the regulation applies outside of the narrow context in which it was adopted.

In his briefing, Alzokari also cites the statement of the D.C. Circuit in *L. Xia*, *supra*, that a "passport – even if already administratively cancelled – would *seem* to satisfy [the] *prima facie* requirement [at the first stage of the Prima Facie

Framework].” *L. Xia*, 865 F.3d at 652 (emphasis added). But this observation by the D.C. Circuit lacks substantial persuasive value. The observation was dicta, was somewhat equivocal (as evidenced by the court’s use of the word “seem”), and was unaccompanied by any reasoned analysis as to *why* a canceled passport amounts to *prima facie* proof of citizenship. And Alzokari offers no such analysis in his briefing.

Finally, Alzokari argued at the summary judgment hearing that the Court should treat a canceled passport as *prima facie* evidence of citizenship under the principles set forth in *Schneiderman v. United States*, 320 U.S. 118 (1943). The issue in *Schneiderman* was whether the government had lawfully denaturalized a citizen based upon his involvement with the Communist Party both before and after his naturalization. *See Schneiderman*, 320 U.S. at 122–124. The Supreme Court vacated the lower court decision upholding the denaturalization. In so doing, the Supreme Court stressed that because the holding of citizenship is a matter of the highest significance, the government must satisfy a heavy evidentiary burden in denaturalization proceedings where it seeks to strip away a person’s citizenship:

> This is not a naturalization proceeding in which the Government is being asked to confer the privilege of citizenship upon an applicant. Instead the Government seeks to turn the clock back twelve years after full citizenship was conferred upon petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from that status. In its consequences it is more serious than a taking of one’s property, or the imposition

> of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof.

*Id.* at 122. Alzokari argues that this passage stands for the proposition that "once you have agreed that somebody is a [United States] citizen, the burden is now upon you to prove by clear and convincing evidence" that he is not.[5] Stated another way, Alzokari reads *Schneidermann* to establish that when the government recognizes a person as a citizen, that recognition is *prima facie* evidence of the person's citizenship. Applying that principle to this case, he argues that the State Department "agreed" that he was a citizen when it issued his original passport, and he says that that recognition of his citizenship is, in effect, *prima facie* evidence that he is a citizen.

This argument fails to account for the critical differences between the naturalization at issue in *Schneiderman* and the issuance/revocation of a passport at issue here. To naturalize a person is to make him a full citizen – with all of the rights and privileges deemed so critical by the Supreme Court in *Schneiderman*. *See Wong*

[5] This quote comes from the Court's unofficial transcript of the January 12, 2026, hearing in this case. An official transcript has not yet been filed.

*Kim Ark*, 169 U.S. at 703. And denaturalizing a citizen strips him of those rights and privileges. *See Schneiderman*, 320 U.S. at 122. In sharp contrast, even though the State Department must determine that an applicant for a passport is a citizen before granting a passport, the grant of a passport does *not* confer citizenship on a person. *See Muthana*, 985 F.3d at 909 n.11. Likewise, the revocation of a passport does *not* affect the passport holder's citizenship. *See* 8 U.S.C. § 1504(a) ("[t]he cancellation . . . of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued"). Thus, the interests at stake in the revocation of a passport fall far short of those at stake in the denaturalization of a citizen. Because the interests at stake in the passport setting are so materially different than in the denaturalization setting, the rationale from *Schneiderman* upon which Alzokari relies is not a good fit here.

In contrast to Alzokari, the Secretary has cited two decisions in which federal courts have squarely held that a no-longer-valid passport is not *prima facie* evidence of citizenship. *See Patel v. Rice*, 403 F.Supp.2d 560, 563 (N.D. Tex 2005); *Edwards v. Bryson*, 578 Fed. Appx. 81 (3rd Cir. 2014). Alzokari has not presented any persuasive arguments as to why the Court should reject or decline to follow those decisions here. Moreover, those decisions seem to be in harmony with Congress' view of the evidentiary value of passports. As noted above, the Passport Proof

Statute provides that a passport is evidence of citizenship "during its period of validity." 22 U.S.C. § 2705. Congress has never suggested that a passport constitutes any evidence of citizenship after it is no longer valid.[6]

In sum, Alzokari has not presented persuasive argument or authority supporting his contention that a canceled passport constitutes *prima facie* evidence of citizenship, nor has he offered a persuasive rebuttal to the Secretary's contrary authority. Alzokari has therefore failed to establish that his canceled passport is *prima facie* evidence of his citizenship.

---

[6] Before Congress established in the Passport Proof Statute that a valid passport is evidence of citizenship, the federal courts had repeatedly held that a passport is *not* "competent evidence of citizenship." *Urtetiqui v. D'Arcy*, 34 U.S. 692, 699 (1835). *See also Edsell v. D. Charlie Mark*, 179 F. 292 (9th Cir. 1910) (explaining that "[t]he passport issued to the appellee by the Department of State was not evidence of his citizenship."); *Miller v. Sinjen*, 289 F. 388, 394 (8th Cir. 1923) (stating that a passport is not "evidence that the person to whom it is granted is a citizen of the United States"); *In Re Gee*, 71 F. 274, 276 (N.D. Cal. 1895) (explaining that a passport is not evidence of citizenship even when a statute provides that only citizens may obtain passports); *Peignand v. Immigration and Naturalization Service*, 440 F.2d 757, 760 (1st Cir. 1971) (recognizing "the ancient and durable judicial precedent to the effect that a passport is not 'competent evidence of the fact of citizenship.'"). *But see Gillars v. United States*, 182 F.2d 962, 981 (D.C. Cir. 1950) (suggesting, without citation to any supporting authority, that "[a] passport is some, though not conclusive, evidence of citizenship.") The Passport Proof Statute appears to create a limited exception to that general rule for still-valid passports. Alzokari's canceled passport does not fit within that exception.

**b**

Alzokari argues in the alternative that even if a canceled passport is generally not *prima facie* proof of citizenship, the Court should treat his canceled passport here as proof of his citizenship under the doctrines of judicial estoppel and collateral estoppel. More specifically, he contends that the Secretary's arguments in the D.D.C. Action and the decision of the district court in that action estop the Secretary from arguing here that his passport is not *prima facie* evidence of his citizenship. The Court respectfully disagrees.

**i**

The Court begins with collateral estoppel, also known as issue preclusion. "[T]he four requisites for issue preclusion are: 1) the issue precluded must be the same one involved in the prior proceeding; 2) the issue must actually have been litigated in the prior proceeding; 3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; and 4) the prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue." *Central Transport, Inc. v. Four Phase Systems, Inc.*, 936 F.2d 256, 259 (6th Cir. 1991). Here, Alzokari says that the "issue precluded" is whether a canceled passport is *prima facie* evidence of citizenship. But Alzokari cannot show that at least two elements of the collateral-estoppel test are satisfied with respect to that issue.

First, the issue of whether a canceled passport is *prima facie* evidence of citizenship was not "actually litigated" in the D.D.C. Action. As noted above (*see* Section (II)(E)), the first mention of the evidentiary weight of the revoked passport came in the reply brief filed by the Secretary in support of his motion to dismiss. (*See* Reply in Support of Def.'s Mot. to Dismiss, *Alzokari v. U.S. Dep't of State*, No. 20-937, at *2 (D.D.C. Oct. 07, 2020) (quoting *L. Xia*, 865 F.3d at 656).) And the reply brief contained only a passing reference to that issue. (*See id*.) Just as importantly, Alzokari never addressed the issue in any of his submissions to the court in the D.D.C. Action. Simply put, the parties in the D.D.C. Action did not meaningfully dispute or address the question of whether a canceled passport is *prima facie* evidence of citizenship. The issue was therefore not actually litigated in that case.

Second, a determination of that issue was not "a critical and necessary part of the decision" in the D.D.C. Action. The dispositive issues before the court in that action were (1) whether an action under Section 1503(a) is an adequate alternative to an action under the APA and (2) whether the plaintiff's burden of proof in an action under Section 1503(a) is meaningfully higher than his burden in an action under the APA. *See Alzokari*, 2021 WL 4622459, at *2–3. The court in the D.D.C. Action did not have to decide, and did not decide, the precise question of whether a canceled passport is *prima facie* evidence of citizenship. *See id.* While the court in

that action did say in a parenthetical that the D.C. Circuit had previously "not[ed] that '[p]resenting proof of a ... passport—even if already administratively cancelled—would seem to satisfy that *prima facie* requirement,'" *id*. at *3 (quoting *Xia*, 865 F.3d at 656), that parenthetical cannot reasonably be understood as a "critical and necessary part of the decision."

For all of these reasons, the Secretary is not collaterally estopped from arguing here that a canceled passport is not *prima facie* evidence of citizenship.

**ii**

The Court now turns to judicial estoppel. As noted above (*see* Section (V)(A)), "[j]udicial estoppel 'forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.'" *Owens*, 54 F.3d at 275 (quoting *Teledyne Industries, Inc*, 911 F.2d at 1217). As further noted above, judicial estoppel must always be applied "with caution," and it must be applied "even more narrowly" against the government. *Audio Technica U.S., Inc.*, 963 F.3d at 575. For two reasons, the Court concludes that the Secretary is not judicially estopped from arguing that Alzokari's canceled passport is not *prima facie* evidence of his citizenship.

First, the Secretary did not "unequivocally assert[]" the opposite position in the D.D.C. Action: The Secretary did not contend in that action that Alzokari's canceled passport *was prima facie* evidence of his citizenship. On the contrary, as

noted above, the Secretary first mentioned that issue in his reply brief, and his statement there with respect to the evidentiary value of a canceled passport was *equivocal*. He noted that a canceled passport "may" constitute *prima facie* evidence of citizenship. (Reply in Support of Def.'s Mot. to Dismiss, *Alzokari v. U.S. Dep't of State*, No. 20-937, at *2 (D.D.C. Oct. 07, 2020).)[7] That statement is too indefinite to warrant application of judicial estoppel – especially against a government defendant like the Secretary.

Second, the Secretary did not "successfully" assert that Alzokari's canceled passport was *prima facie* evidence of his citizenship. The "successfully" asserts prong of the judicial estoppel test is satisfied "only if the first court adopted the position urged by the party, either as a preliminary matter or as part of a final disposition." *Pennycuff v. Fentress County Bd. of Educ.*, 404 F.3d 447, 453 (6th Cir. 2005) (cleaned up). That did not happen with in the D.D.C. Action with respect to the issue of whether Alzokari's canceled passport amounted to *prima facie* evidence of his citizenship. As explained in detail above, the Secretary did not urge the court in that action to specifically conclude that a canceled passport is *prima facie*

---

[7] Moreover, in the very next sentence of the Secretary's reply brief, the Secretary seemed to *agree* with Alzokari that his (Alzokari's) evidence – which included his canceled passport – did not amount to *prima facie* evidence of citizenship. (Reply in Support of Def.'s Mot. to Dismiss, *Alzokari v. U.S. Dep't of State*, No. 20-937, at *2 (D.D.C. Oct. 07, 2020).) This follow-up sentence underscores that the Secretary did not "unequivocally" assert in the D.D.C. Action that Alzokari's canceled passport amounts to *prima facie* evidence of his citizenship.

evidence of citizenship, and the court did not so conclude. Again, its sole reference to that issue was one parenthetical in which the court said that the D.C. Circuit had "not[ed]" that a canceled passport would "seem" to be *prima facie* evidence of citizenship. That parenthetical was neither a holding of the court nor a necessary building block of the court's actual holding; it was simply a passing observation. Alzokari has not shown that such an observation buried in a parenthetical is sufficient to warrant the invocation of judicial estoppel – especially against a government defendant like the Secretary.

**VI**

While the Court concludes that Alzokari is not entitled to declaration of citizenship under Section 1503(a), the Court – like other courts confronting similar circumstances – nonetheless feels compelled to express its "[d]eepest sympathy for [Alzokari]'s position." *Hizam*, 747 F.3d at 111 (reluctantly affirming decision to deny declaration of citizenship sought under Section 1503(a)). As of today, Alzokari has spent more than 30 years building a life in this country – marrying here, having children here, buying homes here, and starting several businesses here – in reliance on his understanding that he was a citizen and would be entitled remain here for the rest of his life. And he now faces possible removal.

Alzokari is in this predicament, in large part, because the State Department "lacked diligence in correcting" its error in originally issuing his passport. *Id.*

Indeed, the State Department's own records reflect the Department's conclusion *in 2002* that Alzokari's father was unable to prove Alzokari's status as a citizen. (*See* Notes on Withdrawal Notice, ECF No. 18-4, PageID.115-117.) Yet, the Secretary waited *16 years* (until 2018) to formally question Alzokari's citizenship and to take action to cancel his passport. The State Department even continued to renew Alzokari's passport during those intervening 16 years. If the State Department had acted sooner – and with even a modicum of diligence – Alzokari surely would not have built his life here based upon his understanding that he was a citizen.[8]

This is thus a case in which the equities "overwhelmingly favor" Alzokari.[9] *Id*. But this Court "lack[s] the authority to exercise [its] equitable powers to achieve a just result here." *Id.* Indeed, it is well-established that a federal court may not invoke its "equitable powers" to "confer citizenship" upon a person, like Alzokari,

---

[8] There is no evidence in the record that Alzokari had any reason to question whether he was a citizen before the State Department canceled his passport in 2018. He was only 17 years old in 2002 when the State Department concluded that his father could not prove his citizenship, and the Secretary has not presented any evidence that Alzokari was ever informed (by anyone) that his father had been unable to establish his citizenship. Nor has the Secretary presented any evidence that before 2018 Alzokari had any reason to doubt that, as his often-renewed passport had reflected for so many years, he was a citizen.

[9] To be sure, Alzokari's father bears some blame for his predicament. There is no indication that his father ever told him that he (his father) had been unable to prove his (Alzokari's) citizenship in 2002. If his father had so informed him, he presumably would not have built his life here based upon his understanding that he qualified for citizenship.

who fails to show that he satisfies the qualifications for citizenship set forth in the Constitution and Acts of Congress. *I.N.S. v. Pangilinan*, 486 U.S. 875, 885 (1988). *See also Fedorenko v. United States*, 449 U.S. 490, 517 (1981); *Wong Kim Ark*, 169 U.S. at 702. So, the Court must deny relief that, in fairness, should be awarded to Alzokari.

**VII**

For all of the reasons explained above, the Secretary's Motion for Summary Judgment is **GRANTED**, and Alzokari's Cross-Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: September 15, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 15, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126